JIMMIE McGOWAN, Plaintiff-Appellant, v. THE DEPARTMENT OF CORRECTIONS *et al.*, Defendants-Appellees.

Second District   No. 2—86—1084

Opinion filed December 10, 1987.—Rehearing denied February 23, 1988.

Gail E. Mrozowski, of Cornfield & Feldman, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Lawrence W. Smith, of Illinois Department of Corrections, of Chicago (Donald R. Zoufal, Special Assistant Attorney General, of counsel), for appellee Illinois Department of Corrections.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Jimmie McGowan, appeals from a decision of the circuit court of Du Page County, which on administrative review upheld the Illinois Department of Correction's (Department's) decision to discharge him. Plaintiff was a certified employee of the Department, holding the position of youth supervisor II at a facility of the Department known as the Illinois Youth Center at Du Page (IYC-Du Page). Plaintiff began employment with the Department in March 1972, and charges for his discharge were brought by the Department in July 1981. Plaintiff requested a hearing on the charges before the Civil Service Commission of the State of Illinois (Commission), and said hearings commenced before a hearing officer appointed by the Commission.

The charges against the plaintiff were based upon an incident which allegedly occurred on November 14, 1980. Plaintiff was charged with having had sexual intercourse with a female youth who was in the custody of the juvenile division of the Department at IYC-Du Page.

Initially called as an adverse witness, plaintiff testified that on November 14, 1980, he was assigned to Delta Cottage during the 2 p.m. to 10 p.m. shift. On that day there were approximately six or seven female inmates in Delta Cottage. Delta Cottage was not a permanent residence for inmates but was used for inmates who were entering the facility and had disciplinary problems or medical problems.

On the date in question, the Delta Cottage inmates were locked in their rooms with the exception of one inmate, Regina Cochran (Cochran), who was being admitted and, therefore, was not required to be locked in a room.

Plaintiff testified that he first became aware of Cochran when he entered the office of Delta Cottage at 2 p.m. and that he spoke with Cochran for a few minutes and informed her of the rules and regulations concerning the IYC-Du Page. He also stated that he questioned her as to why she had been sent· to IYC-Du Page. Plaintiff said that the conversation lasted about 15 to 20 minutes and that he then went on with his regular duties in Delta Cottage.

Plaintiff further testified that at approximately 8 p.m., when the students were being rotated, Cochran came back into his office, and he requested that she clean the dayroom. Plaintiff stated that Cochran cleaned the dayroom, and shortly thereafter another security officer came into the cottage for the purpose of permitting the cottage's inmates to take showers. At approximately 9:30 p.m., chief of security Grisette came into the cottage to distribute medications, and, at about 10 p.m., plaintiff was relieved of his duties.

Cochran testified that she was committed to IYC-Du Page in November 1980. She had originally been incarcerated at a Winnebago County facility on a prostitution charge. There she assaulted a· staff member and, as a result, was sent to IYC-Du Page. Cochran testified that on the way to IYC-Du Page, she was riding with another inmate, Diana Darwin, who told her that the male staff members at the facility were having sex with female students. Cochran further testified that she arrived at the facility on November 14, 1980, at approxi·mately 11 a.m., and after a short period of time, was taken to Delta Cottage. She stated that at approximately 2 p.m. on that date, plaintiff came on duty at that cottage and that she knocked on her cell's door and told him that she was not supposed to be locked up. Cochran testified that later in the afternoon, she was allowed to be in the recreation room and stayed there until after dinner when plaintiff then called her into his office, had her sit down, and began asking her questions about her family, children, and boyfriend. She then testified that plaintiff told her to go into the cottage's bathroom and that plaintiff then came in behind her. She said that plaintiff shut the door and told her to pull her pants down, which she did. She testified that plaintiff then pulled his pants down, and they had sex on the floor. Cochran stated that she told plaintiff at that time that students or staff might come into the bathroom but plaintiff told her he wasn't worried. Thereafter, Cochran stated that she changed her clothes,

washed up,. and approximately an hour later, plaintiff asked her to clean the bathroom.

Cochran testified that she had a conversation approximately two to three days later with another resident, Diana Darwin, about what had occurred. She stated that she did not inform any administrator or staff member as to the events which allegedly had taken place on November 14, 1980, until late February or early March 1981. She testified that she asked Ms. Cooper, a counselor at IYC-Du Page, about an ongoing investigation concerning complaints that staff members and students were engaged in sexual relations. Cochran did not report the incident at that time but reported it approximately a week later. Cochran testified she waited over four months to report the alleged incident because she was fearful of reprisals.

Cochran further testified that on the date in question she had the opportunity to speak about the incident with other students, chief of security Grisette and supervisor Hazelwood; however, she did not do so. She testified that plaintiff never threatened her or had any further sexual contact with her after the alleged incident.

Cochran had testified previously at the plaintiff's criminal trial which arose from this incident. However, at the trial before the Commission she denied testimony she gave at the criminal trial that there was no reason why she waited to report her alleged sexual encounter with plaintiff and that she had accused the plaintiff in order to get back at him for the disciplinary reports he had written against her.

Plaintiff testified that at no time did he have a conversation with Cochran concerning sex, her family, or babies. He further testified that at no time did he have sexual intercourse with her. Plaintiff stated that he first was aware of Cochran's allegations in approximately March or April 1981. He also testified that between November 1980 and March 1981, he acted as a supervisor of Cochran's cottage and reported her for disciplinary infractions five or six times during that period. These write-ups reduced Cochran's privileges.

During the course of the hearings in this cause, several other witnesses testified concerning IYC-Du Page; however, there was no other testimony concerning the incident in question. The Department introduced two evidence depositions which were admitted. These were the depositions of Charlene Barrett (Barrett) and Jackie Shoemaker (Shoemaker), both former inmates of IYC-Du Page. Both depositions were held pursuant to orders by the hearing officer and were taken without the presence of counsel for plaintiff or plaintiff. The deposition of Barrett was taken at a women's correctional facility in Georgia. Shoemaker was deposed in Fort Worth, Texas.

Barrett's deposition primarily concerned a conversation she had with her friend, Cochran, and several other inmates of IYC-Du Page in April 1981 concerning Barrett's involvement with Willie Nash, a Department employee. At that time, Cochran told Barrett that she had had sex with plaintiff. Barrett also testified that nobody liked plaintiff and that he wasn't "anything." She also testified that plaintiff would look at the female inmates "up and down" and that she could tell he wanted something by his expression. Barrett did not testify as to when she observed this alleged behavior.

In her deposition, Shoemaker testified that during her incarceration at IYC-Du Page, she had several conversations with plaintiff which were sexual in nature. She also testified that plaintiff kissed her on one occasion and that he gave her his home address and phone number. She further testified that she wrote a letter to plaintiff and sent it to him at IYC-Du Page sometime in late March or early April 1981.

Plaintiff testified that he had never seen the letter from Shoemaker. He also testified that he did not kiss or fondle Shoemaker.

An investigator, Eugenia Dressel, testified that she was present at an interview of Shoemaker on March 24, 1981. At that time Shoemaker told the investigators that she had no knowledge of sexual activity between staff and inmates at IYC-Du Page, she denied kissing plaintiff, being fondled, or having sexual relations with plaintiff and stated that she was prejudiced against blacks and had never been with a black man.

At the close of the evidence hearing, the hearing officer concluded that the charges had been proved and that the charges warranted plaintiff's discharge. The Commission adopted the hearing officer's decision on November 21, 1984. The circuit court then upheld the Commission's decision, and this appeal followed.

On appeal plaintiff raises the following issues: (1) the Commission's hearing officer denied plaintiff his right to due process by admitting and relying upon the evidence depositions of Shoemaker and Barrett and the letter allegedly sent by Shoemaker to plaintiff; (2) certain evidence admitted by the hearing officer was irrelevant, immaterial, and, consequently, should not have been admitted into evidence; and (3) the Commission's decision to uphold plaintiff's discharge was contrary to the manifest weight of the evidence.

Regarding the first issue, plaintiff contends that the Commission upheld his discharge on the basis of acts which were not part of the record. Specifically, he maintains that he was deprived of due process when the hearing officer admitted into evidence the Shoemaker and

Barrett depositions and subsequently relied in part upon these depositions in making her decision.

At the hearing, defendants sought to have both depositions and a letter allegedly written by Shoemaker to plaintiff admitted as evidence. Plaintiff objected to this evidence, stating that it was irrelevant and immaterial to this case. The court admitted both depositions and the letter into evidence.

At her deposition, Shoemaker testified that in September or October 1980, she was sent to IYC-Du Page for violating probation. There she met the plaintiff, who was working as a guard at the facility's Alpha cottage. She stated that plaintiff asked her if she wanted to have his baby, and that he would take care of her if she had his child. She further testified that on one occasion, plaintiff arranged to be alone with her in a storage area. Shoemaker stated that when they were alone, plaintiff put his arms around her and kissed her. She said she was frightened by his advance and walked away from him. She then said that plaintiff asked what was wrong and said that he would give her time to "think about it." Shoemaker said that she took this to mean that plaintiff was telling her to consider whether they would sleep together. She stated that at no time did the physical interaction between plaintiff and her ever go beyond his putting his arms around her and kissing her.

Also admitted into evidence was a letter allegedly sent by Shoemaker to plaintiff some months after her release from IYC-Du Page. The letter contained plaintiff's home and business addresses. Shoemaker testified that plaintiff gave her his home address and telephone number. The letter contained no allegations of any sexual relations between the plaintiff and her but referred in vague and often contradictory terms to their "relationship."

In her deposition, Barrett testified that she had been incarcerated at IYC-Du Page for all or parts of 1979, 1980, and 1981. She stated that she had seen plaintiff while on duty look at female inmates "up and down." She further testified that plaintiff would almost "fall off the chair" to look at the students. Barrett also stated that she had seen plaintiff strike one of the students in her cottage.

Plaintiff contends that *Secrest v. Department of Corrections* (1978), 64 Ill. App. 3d 458, should be controlling here. *Secrest* involved the discharge of a Department employee who had been charged with slapping an inmate across the face. At the hearing, the Director of the Department testified that his dismissal of plaintiff was based in part on memoranda in plaintiff's personnel file which indicated plaintiff had been involved in similar incidents with other stu-

dents. The Director further testified that but for the incidents described in the memoranda, he would have suspended plaintiff for 10 days rather than dismiss him.

The *Secrest* court held that the testimony of prior unrelated incidents could "only serve to color the outlook of the hearing officer and encourage her to conclude that plaintiff was a man given to attacks on residents of the Youth Center and who therefore should be dismissed for the earlier events, even if he were arguably not guilty of the present charge." (*Secrest*, 64 Ill. App. 3d at 460.) The court held that the admission of the evidence of prior incidents resulted in a substantial injustice to plaintiff and, therefore, constituted a denial of his right to due process.

In her findings regarding the instant case, the hearing officer discussed evidence contained in the depositions of Barrett and Shoemaker and the letter sent by the latter to plaintiff in March 1981. The hearing officer concluded her listing of the findings as follows:

> "The testimony of witnesses has established a *pattern of conduct* on the part of Respondent that is incompatible with his job responsibilities as a Youth Supervisor. Based on the evidence presented it is recommended that the discharge be upheld." (Emphasis added.)

As a result, plaintiff argues that he was not afforded procedural due process protections against the additional charges of misconduct.

Defendant contends that the facts of *Secrest* are easily distinguishable from those of the present case. While the cases are not identical, they are sufficiently similar for us to look to *Secrest* for guidance. Further, defendant argues the hearing officer's use of the term "pattern of conduct," which is found in her concluding paragraph (noted above), relates solely to plaintiff's alleged involvement with Cochran. This assertion is at odds with our understanding of the phrase "pattern of conduct." From our reading of the record and the hearing officer's findings, there is little doubt that the hearing officer was referring to evidence contained in Shoemaker's and Barrett's depositions, as well as evidence presented regarding Cochran. We find that plaintiff's involvement with all three individuals contributed to the pattern of conduct which resulted in the Commission's upholding of his discharge.

Further, defendant asserts that this court should conclude that the Shoemaker deposition was properly admitted to establish plaintiff's *modus operandi* and was not the basis for the discharge.

■■ Regarding *modus operandi*, our supreme court has found that evidence that the accused has perpetrated another crime wholly inde-

pendent or disconnected from the one for which he is being tried is not admissible unless there are unique and distinctive elements common to the acts committed. (*People v. Lehman* (1955), 5 Ill. 2d 337.) There must be significant connecting links between the crimes; these must be strikingly similar. (*People v. Tate* (1981), 87 Ill. 2d 134.) Defendant asserts that the alleged instance of sexual intercourse involving Cochran, plaintiff's relationship to Shoemaker, and Charlene Barrett's description of the manner in which plaintiff looked at female inmates demonstrate his *modus operandi vis-a-vis* his charges.

We do not find any unique or distinctive elements that are common to the acts allegedly committed. The alleged act of sexual intercourse with Cochran was characterized by a directness, aggressiveness, and hostility that was absent from the other instances. Ogling female inmates and putting arms around and kissing an inmate are not strikingly similar to a straightforward, assertive act of sexual intercourse.

Taken together these alleged instances do not demonstrate plaintiff's *modus operandi*. Considering the case as a whole, we find that plaintiff was prejudiced by the improper admission of the Barrett and Shoemaker depositions and the Shoemaker letter to the extent that he was denied his right to due process. Because of our decision on this issue, we do not need to reach the other issues raised by the plaintiff. For the reasons stated above, we reverse the Commission's decision and remand this matter for a new hearing consistent with this opinion. We also instruct the Commission to appoint a new hearing officer to preside over further proceedings.

Reversed and remanded.

UNVERZAGT and DUNN, JJ., concur.